# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| KIMBALL AREA PUBLIC SCHOOLS, INDEPENDENT SCHOOL DISTRICT NO. 739, | Case No. 23-CV-2637 (NEB/LIB) |
| Plaintiff/Counter-Defendant, | ORDER ON MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD |
| v. | |
| I.R.M., by and through his parent, L.M., | |
| Defendant/Counterclaimant. | |

---

This case involves judicial review of a due process administrative decision issued under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* The IDEA requires states accepting federal funds to provide children with disabilities with a free appropriate public education ("FAPE"). To provide a FAPE, the school district must formulate an individualized education plan ("IEP") tailored to the disabled child's unique needs. *See id.* § 1400(d)(1)(A).

I.R.M. ("Student") is disabled. His parent L.M. ("Parent") asked Kimball Area Public Schools, Independent School District No. 739 ("District") to provide staff support for Student's service dog while Student is present in school. The District declined to do so. The District later proposed an IEP for Student that does not include staff support for

the service dog and extends Student's school day from a partial day to a full day. Parent objected to the proposed IEP.

After an administrative due process hearing, the administrative law judge ruled in the District's favor on all but three issues: (1) Student requires the use of his service dog to access a FAPE; (2) the tasks of a service dog handler qualify as a "related service" under 34 C.F.R. Section 300.34; and (3) the proposed IEP does not provide Student with a FAPE because it requires him to attend school all day. The District brought this action to overturn the ALJ's decision on these three issues, and each party now moves for judgment on the administrative record. For the reasons below, the District's motion (ECF No. 23) is granted and Student and Parent's motion (ECF No. 30) is denied.

## BACKGROUND

### I.    Student

Student is an eleven-year-old student who currently attends public school at the District. (Tr.[1] at 16, 21.) Student is certified as disabled. (Tr. at 30–31.) His disabilities include autism spectrum disorder ("ASD") as well as several complex medical diagnoses.[2] (Tr. at 16; OAH-03293.) Because of his disabilities, Student is triggered by

___

[1] "Tr." references the transcripts of the five-day administrative hearing held in May 2023. These transcripts are found in the administrative record in ECF No. 19-1 (under seal). The page numbers of transcripts are sequential, except for volume III, which begins with page 1. To avoid confusion, the Court cites this particular transcript as "Tr. vol. III at __."

[2] Student has cognitive impairment, speech delays, autism, sensory processing issues, sleep disturbances, gait instability, and a high pain threshold. (Tr. at 16.) Student has a

events in his environment, such as buses, coughing, and paper being torn. (Tr. 26–27.) He

is also triggered by being forced to do things or being asked to wait. (Tr. at 96.) Student

fixates on items in his environment, such as Oreos, vehicles, fire alarms, and iPads. (Tr.

at 27–29.) He engages in self-injurious behaviors, including biting and hitting his head.

(Tr. at 29; Tr. vol. III at 101.) He also demonstrates aggressive behaviors toward others,

including pulling hair, biting, and pinching. (Tr. at 30; *see* OAH-03554, OAH-03557, OAH-

03777–84 (record of Student biting himself and staff at school September 2022–April

2023).) Student also sometimes engages in elopement, that is, leaving a room or building

without direction or permission. (Tr. at 31–32, 744.)

## II.    Stay-Put IEP

Student open-enrolled in the District at the beginning of his kindergarten year, at

which time he had an IEP. (Tr. at 21–22.) In January 2022, when Student was in first grade,

the District prepared an IEP for him ("stay-put IEP"). (OAH-03220–47.) The stay-put IEP

includes an altered school day, in which Student attends school from 8:00 a.m. to 12:15

p.m., and is home in the afternoon. (OAH-03236.) Under the stay-put IEP, Student

receives support from a one-on-one paraprofessional while he attends school. (*Id*.)

Student's paraprofessional supports Student by: monitoring him for seizure activity and

self-injurious behaviors; identifying and de-escalating behavior episodes; keeping him

---

Full-Scale IQ score of 40, below the first percentile rank. (OAH-03293.) His adaptive
functioning is in the "low" range and his academic skills are in the "very low" range.
(OAH-03286, OAH-03294.)

safe while walking; and assisting him with activities of daily living, classroom activities, and transitions (going from one location to another). (OAH-03235-03236.)

The stay-put IEP accommodates private Applied Behavior Analysis ("ABA") therapy, which Student receives while at home in the afternoons four days per week. (OAH-03222, OAH-03236; Tr. at 239.) Sarah Brixius, a clinical supervisor with Behavioral Dimensions, works with Student on his ABA therapy to build functional communication skills that he can use to communicate his needs to people to respond to stressors. (Tr. at 360, 362, 381.) Brixius testified that Student's ABA treatment is "medically necessary," and that Student cannot attend school full-time and also receive the prescribed hours of ABA treatment (about 16 to 17 hours each week). (Tr. at 380–82.) She maintains that if the ABA therapy were abruptly discontinued, Student would probably regress behaviorally. (Tr. at 382.)

The stay-put IEP also accommodates Student's outpatient speech therapy for forty-five minutes and hippotherapy (horse therapy) once a week. (OAH-03222; *see* Tr. at 141, 144–45, 147 (testimony of Student's speech-language pathologist).)

## III.    Service Dog

Student qualified for a service animal because he has disabilities that an assistance dog can help mitigate. (Tr. vol. III at 17.) Student received a service dog, here

4

denominated "Delta," in May 2022.[3] (Tr. at 37, 40.) Delta is a certified autism assistance dog trained by Can Do Canines. (Tr. at 40; Tr. vol. III at 63.) Delta is task-trained to mitigate the Student's disability, including through a "cape-stay"[4] to prevent elopement, and by providing "kisses" to Student to meet his sensory needs or to interrupt his upsets and redirect him from the triggers to calm him down. (OAH-03646; Tr. at 57–59; Tr. vol. III at 41.) Delta also assists Student with transitions. (Tr. at 57.) Delta is trained to auto-respond to Student and to respond on cue. (Tr. at 59–60; Tr. vol. III at 22–23, 47; OAH-03727.) Student can cue Delta when he is regulated. (Tr. at 61–62.)

Parent testified that Student and Delta are together "24/7", including during Student's private ABA therapy and speech therapy. (Tr. at 57, 61, 147, 373.) Student's private speech-language pathologist testified that Delta supported Student's sessions with her, noting that Delta has sensed when Student was experiencing stress and auto-responded by providing support and kisses. (Tr. at 147–48.) She stated that Delta "has

---

[3] "Delta" was the pseudonym given by the administrative law judge to Student's service dog. (ECF No. 19-1 at 3271-93 ("ALJ Order") at 5 (native pagination).) The Court adopts that naming convention here.

[4] "Cape-stay" requires Student to be tethered to Delta. Delta's cape is "the piece of equipment that [Delta] wears that . . . buckles in two spots on [Delta], it has two zippered pouches, and then it has a handle . . . that [Student] holds as his anchoring mechanism when he's walking." (Tr. at 57–58; *see generally* OAH-03462 (photograph).) The tether is a strap that "clips from [Delta's] cape to a belt that [Student] wears," which cues Student "to stay with [Delta] and prevents elopement in instances when he is trying to elope." (Tr. at 58, *see* Tr. at 65.)

provided a strategy for calming and coping that has given us so much more time on task."
(Tr. at 154.)

Parent testified that being paired with Delta was "life[-]changing" for Student. (Tr.
at 64.) Student has "many more opportunities to access public spaces" and "experience
new things." (Tr. at 56.) Prior to having Delta, Student sometimes required a wheelchair
when he was out in public. (Tr. at 74–75, 91–92.) With Delta, Student can go to the zoo,
public parks, restaurants, movie theaters, sporting events, Target, the mall, the airport,
and on vacation with his family. (Tr. at 64, 69, 73, 76, 78–79, 91, 92.) According to Parent,
Delta can provide an effective and necessary intervention when the Student is in public,
and Delta keeps Student safe, calm, and happy. (Tr. at 68, 77.) Can Do Canines considers
the pairing of Student and Delta to be a success. (Tr. vol. III at 24.)

### IV.    August—mid-October 2022

In August 2022, Parent met with District staff to discuss Delta attending school
with Student. (Tr. at 55–56; Tr. vol. III at 253.) At that time, Principal Joel Timmerman had
no concerns about having Delta in the building. (Tr. vol. III at 253–54.) No decisions were
made regarding Delta at this meeting. (Tr. at 56, 100; Tr. vol. III at 254.)

On September 12, Principal Timmerman emailed Parent, acknowledging that
Delta is a service dog that may attend school with Student, but that school personnel
could not serve as a handler for Delta. (OAH-03254; *see* OAH-03248 (District Policy
No. 535 providing that individuals with disabilities may bring their service animals to

6

school but "[s]chool district personnel are not responsible for the care, supervision, or handling" of service animals).) He explained that for Delta to attend school, either Student would need to serve as handler or Parent would need to provide a separate handler. (OAH-03254.)

Parent responded to the email, arguing that a paraprofessional employed by the District and already serving as Student's "1:1 support" could be the handler. (OAH-03256.) She offered her own services and those of Can Do Canines as trainers to Student's paraprofessionals and teachers. (*Id*.) In response, Principal Timmerman stuck to his position, agreeing that Student's behaviors "could benefit from [Delta] being his tool of choice," but confirming that the District was "still obligated by our legal counsel and our policy that is in place." (OAH-03257.)

On October 17, District staff, Parent, and Can Do Canines representative Elizabeth Reberk met to discuss Delta attending school. (Tr. at 105; Tr. vol. III at 256.) According to Reberk, Student cannot serve as Delta's only handler because he is too young; he needs adult support to utilize Delta. (Tr. vol. III at 36.) Parent requested three accommodations to be supplied by a school employee:

- Hold Delta's leash while Student transitions throughout the school;
- Tether and untether Delta when necessary, such as for toileting; and
- Prompt Student to cue Delta with commands as needed.

(OAH-03559; *see* Tr. at 106–17.)

Two days later, Principal Timmerman denied Parent's request for school personnel to serve as Delta's handler. (OAH-03266-68.) Timmerman acknowledged that the school staff working with Student *could* perform the requested accommodations, but District policy *prohibits* employees from performing this function. (Tr. vol. III at 260–61, 264; Tr. at 853, 870.) The District did not recall being asked to consider whether Delta was necessary for a FAPE at that time. (Tr. vol. III at 266; Tr. at 853.)

## V.    Delta in School

Because the District would not provide the requested support, Parent began attending school as Delta's handler. (Tr. at 88, 108–09.) Parent performed as Delta's handler through the dates of the due process hearing before the ALJ. (Tr. at 109.) The parties cite conflicting evidence about how Student and Delta did in school while Parent was there.[5]

Parent testified that Student receives support from Delta throughout the school day, including during his music and STEM classes. (Tr. at 114–15, 126–27.) She testified that the only time it would be beneficial for Student to be untethered from Delta is in

---

[5] The District cites evidence that Parent caused several disruptions during the school day throughout that period. (*See* OAH-03820–55.) For her part, Parent asserts that the District created "a terrible environment" for her, and that acting as Delta's handler "placed an extreme burden and undue hardship" on her family. (Tr. at 109.) Student's former paraprofessional testified that it was negative for Student to have his Parent serve as Delta's handler. (Tr. vol. III at 211.) Student's special education teacher Megan Daoust testified that having Parent attend school with the Student interfered with his school day, and that it would be better for Student if someone other than Parent acted as Delta's handler. (Tr. at 843–44.)

8

situations where Student needs to move freely, such as during gym class or on the playground. (Tr. at 408.) Delta prevents Student from accessing things that he is not supposed to access, prevents Student from eloping from classrooms, redirects and calms Student's behaviors, and helps him sit and receive instruction in class. (Tr. at 126–27.)

According to Parent, a third, full-time person supporting the Student's use of Delta is unnecessary. (Tr. at 185.) Her argument is that Student has always had a one-on-one paraprofessional at school, (Tr. at 44), and support staff can help Student utilize Delta.[6] (Tr. at 268; Tr. vol. III at 72.) Parent believes that Delta is necessary for Student to receive a free appropriate public education.[7] (Tr. at 183, 237, 265.)

Two District employees testified that Delta's presence in school was either helpful or neutral. Student's physical education teacher testified that when Student is upset and will not stay in one place, Parent will tether Delta to Student to keep him in one spot. (Tr. at 891–92.) Staying in place is important when teaching Student to throw at a target. (Tr.

---

[6] Reberk never observed Student and Delta at school. (Tr. vol. III at 45.) Student's paraprofessionals expressed concerns about acting as Delta's handler during Student's dysregulation. (Tr. vol. III at 175–76, 192, 211; Tr. at 998–99.) But the District's director of special education testified that a paraprofessional "isn't in a position to make th[e] decision" about whether to serve as a handler; the "right and responsibility falls on a superintendent and the building administrator." (Tr. at 1113; *see also* Tr. vol. III at 260–61 (Timmerman testifying that adults currently working with Student could perform the requested accommodations, including holding Delta's leash).)

[7] At the hearing on the parties' motions, Student's counsel acknowledged that Parent was the only witness at the due process hearing to testify that Delta was necessary for Student to receive a FAPE.

at 892.) Student's speech language pathologist, Denise Hawkinson, testified that Delta and Parent (as the handler) do not interfere with her services. (Tr. at 936.)

Other District staff testified to the contrary, that is, that Delta's presence had a negative impact, or that Delta did not seem necessary. Some staff observed Student becoming distracted by Delta rather than focusing on academic tasks. (Tr. vol. III at 160, 192, 194, 215, 228–29.) Some staff also observed that Delta minimally assisted Student with staying on task and seldom helped Student complete a task he found challenging. (*E.g.*, *id.* at 228–29; *see also* OAH-03793.)

## VI.    Request for IEP Accommodation

In November 2022, Parent requested that Student's IEP team consider the same three accommodations requested at the October 17 meeting. (OAH-03566–67.) Student's IEP team met twice with Parent to address her concerns and requests for additional IEP supports. (OAH-03271–74; *see* Tr. at 870.) On November 22, the District notified Parent that it was declining to add the requested accommodations because Delta was not necessary to provide Student a FAPE. (OAH-03275–78; *see* Tr. at 813.) Parent objected and filed a due process complaint, claiming that support for Delta was a related service under 34 C.F.R. Section 300.34. (OAH-03278; *see* ALJ Order at 10 (citing OAH Docket No. 8-1300-38905).)

## VII.    Student's Reevaluation and the District's Proposed IEP

In December 2022, the District reevaluated Student to determine his educational needs. (OAH-03293–94; 20 U.S.C. § 1414(a)(2)(B).) The reevaluation included a functional behavioral assessment ("FBA") completed by Board-Certified Behavior Analyst Courtney Vorell to gather information about the motivations for Student's upsets and aggression. (Tr. at 730, 735–36, 745–46; OAH-03307.) The FBA found that Student was motivated to "access tangibles and escape demands." (OAH-03308; Tr. at 775.)

Student's IEP team prepared an evaluation report of its findings.[8] (OAH-03286–315.) In January 2023, the IEP team and Parent met twice to discuss revisions to Student's IEP based on the reevaluation. (*See* OAH-03343; Tr. at 409–10, 1091, 1093–94.) District staff sought Parent's input related to the IEP, and she maintained that support for Delta was the only accommodation needed. (Tr. at 1093–94, 1095–96, 1181–82.)

In early February, the District proposed a revised IEP ("proposed IEP"). (OAH-03343–47.) The proposed IEP has six goals and over thirty-seven objectives. (Tr. at 1084; *see also* OAH-03321–42.) It includes a new Positive Behavior Support Plan ("PBSP")

---

[8] The reevaluation report notes that Student needs support in school to "reduce elopement – extensive" and that Parent reported that he "wanders/darts away" without regard to safety. (OAH-03288, OAH-03304.) When Vorell spoke with staff to establish the behavior to examine for the FBA, she learned that "elopement had no longer been a concern." (Tr. at 744.) Similarly, when asked at the hearing if Student's attempts to exit her special education classroom prevented him from working on certain goals, Daoust testified, "if it was a consistent thing" but that she could only recall three occasions, which she did not "deem as being a significant issue." (Tr. vol. III at 92–93.)

developed to teach Student skills to replace his biting behavior. (OAH-03343; *see* OAH-03340–42 (PBSP).) It also proposes a full day of school for Student rather than his altered day. (Tr. at 1084 ("Based on the progress he's making and areas where [the District] would like to intensify his services, a full day naturally would be the next step to ensure FAPE for [Student].").) The proposed IEP does not include staff support for Delta. (*See* OAH-03321–42.) The notice accompanying the proposed IEP noted that the District was "agreeable" to discussing the feasibility of making time and space available for Student's ABA provider to work with him during school hours. (OAH-03344.) Parent objected to the proposed IEP. (OAH-03347.)

Despite Parent's rejection of an IEP that lacked staff support for Delta, the District notified Parent of its intent to proceed with the proposed IEP. (OAH-03351.) Parent again objected and pulled Student out of school. (OAH-03354, OAH-03771.) This decision rendered the then-pending complaint moot, so the ALJ granted the District's motion to dismiss Parent's first due process complaint. (*See* ALJ Order at 11.) Parent immediately re-enrolled Student. (Tr. at 109–10.)

In mid-March 2023, Parent again requested staff support for Delta as a "related service." (OAH-03573.) A week later, the District denied her request; Parent again objected. (OAH-03355–58.) Parent filed a second due process complaint, asserting that the District's refusal to include staff support for Delta in Student's IEP violates his right to FAPE and the Americans with Disabilities Act ("ADA"). (ECF No. 22-1 at 3–18 (OAH

12

Dkt. No. 8-1300-39140); ALJ Order at 11.) The District also filed a due process complaint requesting that an ALJ override Parent's objection to the proposed IEP. (ALJ Order at 12 (OAH Dkt. No. 8-1300-39157).)

## VIII.   Due Process Hearing and ALJ Decision

A consolidated due process hearing was held before Administrative Law Judge Eric L. Lipman over five days in May 2023. (Tr. at 5.) Fourteen witnesses testified, including Parent, District administrators, Student's teachers, paraprofessionals, therapists, and a representative from Can Do Canines. After the hearing, the ALJ issued a 21-page decision setting forth his findings of fact, conclusions of law, and order.

The ALJ concluded that: (1) Student requires the use of a service dog to access a FAPE; (2) a service dog handler's tasks qualify as a "related service" under Section 300.34; and (3) the District's proposed IEP is not appropriate to meet all of Student's identified needs and provide him with a FAPE because it requires Student to attend a full day of school. (*Id.* at 2, 16–19 (native pagination).) In all other respects, the ALJ supported the District's proposed IEP over Student's objections.

## IX.    This Appeal

The District brought this action to appeal the ALJ's order. (ECF No. 1.) The District does not dispute that Delta can benefit Student, but maintains that Delta is unnecessary for Student to access a FAPE. It also maintains that a full school day is needed for Student to progress toward the many goals identified in his proposed IEP. Thus, the District

challenges the ALJ's three adverse conclusions. Among other relief, the District seeks (1) a partial reversal of the ALJ's order; (2) a finding that the proposed IEP offers Student a FAPE; and (3) an order that the proposed IEP must be implemented over Parent's objections.[9] (ECF No. 1 ¶ 88.) The parties cross-move for judgment on the administrative record.

## ANALYSIS

### I.    Standard of Review

"Under the IDEA, children with disabilities are entitled to a free appropriate public education." *Minnetonka Pub. Schs., Indep. Sch. Dist. No. 276 v. M.L.K. ex rel. S.K.*, 42 F.4th 847, 851 (8th Cir. 2022). A FAPE includes "special education and related services."[10] 20 U.S.C. § 1401(9). The IDEA requires that students with disabilities be educated in the least restrictive environment. 20 U.S.C. § 1412(a)(5). Schools must identify and evaluate a student's need for special education and related services, and create an annual individualized education program. *Minnetonka Pub. Schs.*, 42 F.4th at 851–52; *see* 20 U.S.C. § 1401(9)(D). The IEP must describe the "special education and related services . . . to be provided" so that the child may "advance appropriately toward attaining the annual

---

[9] Parent brings two counterclaims, asserting that District violated Titles II and V of the ADA. (ECF No. 6.) These counterclaims are not the subject of this motion and remain pending.

[10] "Special education" is "specially designed instruction . . . to meet the unique needs of a child with a disability"; "related services" are support services "required to assist a child . . . to benefit from special education." 20 U.S.C. §§ 1401(26), (29).

goals" and, when possible, "be involved in and make progress in the general education curriculum," and "be educated and participate with other children with disabilities and nondisabled children." 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

When parents and a school district disagree on the contents of a student's IEP, they may participate in a due process hearing before an ALJ. *See Minnetonka Pub. Schs.*, 42 F.4th at 851. A party seeking review of the ALJ's decision may bring an action in federal court. 20 U.S.C. § 1415(i)(2)(A); 34 C.F.R. § 300.516. In actions filed under Section 1415(i)(2), courts review the administrative record and hear additional evidence, if requested.[11] *Hansen ex rel. J.H. v. Republic R-III Sch. Dist.*, 632 F.3d 1024, 1026 (8th Cir. 2011).

When a court reviews a school district's compliance with the IDEA after a due process hearing, it is to "make an independent decision, based on a preponderance of the evidence, whether the IDEA was violated." *Minnetonka Pub. Schs.*, 42 F.4th at 852 (citation omitted); 20 U.S.C. § 1415(i)(2)(C)(iii). The Court must "give due weight to the administrative proceedings." *Minnetonka Pub. Schs.*, 42 F.4th at 852 (citation omitted). "This somewhat 'unusual' standard of review is less deferential than the substantial-evidence standard commonly applied in federal administrative law." *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011) (citation omitted). The party

---

[11] Neither party submitted additional evidence, so the Court reviews only the administrative record.

challenging the ALJ's ruling on the IEP bears the burden of persuasion. *See Minnetonka Pub. Schs.*, 42 F.4th at 852.

"Judicial review in IDEA cases 'is, in reality, quite narrow.'" *Osseo Area Schs., Indep. Sch. Dist. No. 279 v. A.J.T. ex rel A.T. & G.T.*, 96 F.4th 1062, 1065 (8th Cir. 2024) (citation omitted). "Courts are limited to reviewing whether the school district followed the IDEA's procedure" (not at issue here) and "whether the student's IEP provided a FAPE." *Id.* The review under the IDEA is limited "[b]ecause judges are not trained educators," so courts "should not substitute [their] own notions of sound educational policy for those of the school authorities." *Kass v. W. Dubuque Cmty. Sch. Dist.*, 101 F.4th 562, 570 (8th Cir. 2024) (citation omitted).

## II.    The Proposed IEP

The Court begins by reviewing the proposed IEP.[12] The parties disagree about whether the District's proposed IEP—without support for Delta and with a full school day—offers Student a FAPE. Whether an IEP offers a FAPE "is a mixed question of law and fact." *K.E. ex rel. K.E.*, 647 F.3d at 804. In examining this issue, the Court must "determine independently the legal significance of the [applicable] facts." *Id.* (citation

---

[12] Other courts have explained that a court's review should "focus on the District's proposed implementation plan, not the parents' preferred alternative." *JG v. Douglas Cnty. Sch. Dist.*, 552 F.3d 786, 802 (9th Cir. 2008); *see A.U., ex rel. N.U. v. Roane Cnty. Bd. of Educ.*, 501 F. Supp. 2d 1134, 1142 (E.D. Tenn. 2007) (similar) (citing *Tucker by Tucker v. Calloway Cnty. Bd. of Educ.*, 136 F.3d 495, 505 (6th Cir. 1998)).

omitted); *see Hansen*, 632 F.3d at 1026 (courts are to consider the ALJ's legal conclusions *de novo*).

A substantively adequate IEP is "tailored to the unique needs" of the student and is "appropriately ambitious," such that it is "reasonably calculated" to enable the student "to make progress appropriate in light of [his] circumstances" and give him a "chance to meet challenging objectives." *Osseo Area Schs.*, 96 F.4th at 1065 (citing *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 401–04 (2017)). In reviewing an IEP, the court must determine "whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 399. "The IDEA 'does not require a school district to maximize a student's potential or provide the best possible education at public expense,' nor does it require specific results." *Minnetonka Pub. Sch.*, 42 F.4th at 853 (citation omitted); *see Barron ex rel. D.B. v. S.D. Bd. of Regents*, 655 F.3d 787, 793 (8th Cir. 2011) ("The IDEA's 'free appropriate public education' requirement sets a floor of educational opportunity: '[T]he Supreme Court has made it clear that the Act does not require states to make available the *best* possible option.'" (citation omitted)).

Based on its understanding of the law and a careful review of the record, the Court reaches a different conclusion than the ALJ—the IEP proposed by District provides Student with a FAPE.

A.    *Evidence Supporting the Proposed IEP*

The record shows that District's proposed IEP is reasonably calculated to enable Student to make appropriate progress based on his circumstances and gives him a chance to meet challenging objectives.[13]

1.    *Behavior Replacement*

If the child's behavior impedes learning, an IEP team must "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior." 20 U.S.C. § 1414(d)(3)(B)(i). "[W]hen a team fails to take this sort of action, that failure can amount to a substantive denial of the child's FAPE." *K.E. ex rel. K.E.*, 647 F.3d at 810.

It is undisputed that Student's self-injurious and aggressive behaviors impede his learning. The proposed IEP offers appropriate instruction to Student to replace those behaviors. As the ALJ acknowledged, the proposed IEP includes a PBSP (positive behavior support plan) developed by Board-Certified Behavior Specialist Vorell, as well as Functional Communication Training ("FCT") and revised educational goals. (ALJ

---

[13] The ALJ seemed to conclude that the service-dog handling issue was driven by cost. He found that the district had a policy "of not underwriting costs for the handling of service animals," so Student's educational programming was "constrained by limitations imposed upon, and outside of, the IEP Team." (ALJ Order at 16–17.) The order cites no evidence for this finding, and the Court found none suggesting that the District refused to include Delta in Student's IEP because of District policy or monetary considerations.

Order at 12–13 ¶¶ 67–71.) But the ALJ Order does not address the likely effectiveness of the proposed IEP.[14]

The proposed PBSP is based on Student's functional behavioral assessment (FBA), which determined that Student engaged in biting and self-injurious behavior to access tangibles and escape demands. (Tr. at 775; OAH-03308.) These functions are similar to the functions determined by Student's ABA provider, (OAH-03482), which supports the FBA's determination. The proposed PBSP adds instruction for Student to communicate his discontent, preferences, and requests appropriately using FCT. (OAH-03340–41.) FCT is a method of teaching alternative forms of communication to expand a student's ability to communicate. (Tr. at 738.) Student's ABA providers have used FCT strategies with Student successfully, (Tr. at 399–400), suggesting that FCT will be successful as prescribed by the proposed IEP. The proposed PBSP also includes strategies to ensure that Student "comes back to demands," so that when he tries to escape a demand (such as biting to avoid schoolwork), the evidence-based "escape extinction" practice with FCT would be used to return him to work. (OAH-03340; Tr. at 740–41.) Vorell testified about the FBA, FCT, the proposed PBSP, and the likely effectiveness of the proposed IEP. (Tr. at 738–44; *see* Tr. at 742–43 (testifying that she would train staff on FCT and that the proposed PBSP

---

[14] The ALJ characterizes the District's position as "claim[ing] that a paraprofessional alone, without [Delta], is sufficient to provide the Student with a FAPE." (ALJ Order at 17 ¶ 14.) In doing so, it appears that the ALJ overlooked the effectiveness of the entire proposed IEP—including the PBSP and FCT—in deciding whether the proposed IEP offers Student a FAPE.

did not differ greatly from the stay-put PBSP, but that the addition of FCT details more intervention).) By teaching replacement behavior that meets Student's reasons for biting, the proposed PBSP aims to reduce biting by showing Student that appropriate communication prompts the desired response. (OAH-03340.)

The Court finds that the District created a "cohesive behavioral management plan" for Student when it conducted the FBA and, based on that assessment, developed the PBSP that is included in the proposed IEP. *See K.E. ex rel. K.E.*, 647 F.3d at 810 (citing *Neosho R–V Sch. Dist. v. Clark*, 315 F.3d 1022, 1028–29 (8th Cir. 2003)).

2.    *Delta*

Parent objects to the proposed IEP because it does not include staff support for Student to access Delta. The record reflects that Delta sometimes assists Student while at school, but that does not make Delta *necessary* for a FAPE.[15] "A FAPE does not necessarily fit precise parental preferences, maximize a student's potential, or provide the best possible education at public expense." *D. L. by Landon v. St. Louis City Sch. Dist.*, 950 F.3d 1057, 1064 (8th Cir. 2020) (citation omitted). Rather, a FAPE "must provide a student with 'some educational benefit' consistent with the goals of their specific IEP." *Id.* (citation omitted); *see Kass*, 101 F.4th at 570 ("The school is not required to provide an optimal

---

[15] Contrary to Parent's assertions, the record reflects that Delta was sometimes, but not always, effective in assisting Student. (*E.g.*, OAH-03764 (Hawkinson Dec. 20, 2022 email noting that Delta helped calm Student when he was upset, and that she and his paraprofessional redirected him to the activity at hand, but then Student was distracted by Delta causing "more disruption" in him refocusing on his activity).)

experience for a student with a disability, but instead must simply provide the student with a FAPE consistent with the IEP." (citation omitted)). Administrative reviewers in other states have found that service dogs, while helpful, were not necessary to offer a FAPE to other students. (*See* ECF No. 26-1 at 6 (*In re: Student with a Disability*, No. 09-6047, 111 LRP 62339 (Fla. SEA, Mar. 9, 2011) (concluding autistic student had "not proven that the presence of his service dog is necessary or warranted"); ECF No. 26-2 at 17 (*Bakersfield City Sch. Dist.*, No. 2008070167, 108 LRP 61412 (Cal. SEA, Oct. 22, 2008) ("Student [with autism] does not require the presence of his dog Thor at school in order to receive a FAPE."); *cf.* ECF No. 26-3 at 4–5 (*Gallia Cnty. Loc. Sch. Dist.*, 102 LRP 9332 (Ohio SEA, Feb. 18, 2002) (concluding that where the "only success achieved in getting [student] to attend school has been when she is accompanied by someone or something that puts her at ease," sufficient evidence showed that student with separation anxiety disorder/social phobia "currently needs the use of a service dog to attend school").)

The ALJ found that Delta is effective in keeping Student calm in classroom settings, and in Student's Developmental Adapted Physical Education ("DAPE") class. (ALJ Order at 4 ¶ 16; *id.* at 7 ¶¶ 37, 39.) As to the DAPE class, the ALJ cited the teacher's testimony that it was sometimes useful for Student to stay in one spot during DAPE class. (*Id.* at 7 ¶ 39 (citing Tr. at 137, 891–92).) But that teacher also testified that before Delta began coming to school, a teacher or paraprofessional would help Student say in place. (Tr. at 892.) The ALJ also found that Delta was effective in keeping Student calm in

classroom settings and permitting Student to remain seated with peers and receive instruction. (ALJ Order at 7 ¶ 37.) But the STEM teacher explained that Student sat with his peers during instruction before Delta came to school with him, and that a paraprofessional effectively addressed Student's upsets or attempts to leave his seat. (Tr. at 905–07; *see also* Tr. at 970 (paraprofessional observing no difference in Student's participation in music class after Delta started attending).)

While the ALJ's findings are afforded "due weight" because he had the opportunity to observe the witnesses' demeanors, the record reveals several examples of Delta not keeping Student calm in school. (*E.g.*, Tr. at 289–90 (Student tried to bite his paraprofessional after he accessed Delta for support).) Nor was Delta successful in keeping Student calm while on a school field trip. During one of Student's upsets at a museum, he bit the wall, his paraprofessional, and possibly Delta. (Tr. at 323–25, 1054–57.) He de-escalated only after a paraprofessional played him a song on her phone.[16] (Tr. at 1055–56.)

Finally, as to elopement: although Parent maintains that Delta is necessary to prevent elopement, the record indicates that at school, Student attempts to elope rarely. (Tr. vol. III at 91–92, 161; Tr. at 885.) And even if deterring elopement is necessary for a FAPE, the District can meet Student's needs without providing support for Delta because

---

[16] Parent, herself, testified that Delta's role "is not to prevent" Student's upsets or self-injurious behavior. (Tr. at 306 ("[Delta's] task is to redirect and calm the self-injurious behavior.").)

Student can be redirected with verbal commands. (*E.g.*, Tr. vol. III at 87.) In addition, the District has other effective measures to deter and prevent elopement. (*E.g.*, *id.* at 137 (effective use of a light up toy), 161–62 (paraprofessional's effective redirection); Tr. at 885–86 (effective redirection).)

The Court concludes that Delta is not necessary to support Student because the services Delta offers can be provided to Student by school staff.[17]

3.     *Length of School Day*

Parent also objects to the IEP because it prescribes a full day of school for Student. As noted above, the District must offer "an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."[18] *Endrew F.*, 580 U.S. at 399. Having reviewed the evidence, the District has shown by a preponderance of the

---

[17] The District also asserts that requiring service-dog handling services to support Student's use of a service dog at school would violate Minnesota law prohibiting the use of unauthorized restrictive procedures, Minn. Stat. § 125A.0942, and regulations about service animals under Title II of the ADA, 28 C.F.R. § 35.136(d)–(e). Because the Court concludes that the District's proposed IEP offers Student a FAPE without Delta, it does not reach these arguments.

[18] In ruling on the length of Student's school day, the ALJ stated that the District had the burden of proving that the proposed full-day program "better meets the Student's needs" than the present altered school day. (ALJ Order at 19 ¶ 29 (citing Minn. Stat. § 125A.091, subdiv. 16, which provides that "[t]he burden of proof at a due process hearing is on the party seeking relief").) The ALJ concluded that the District had not met its burden of proving that the full-day program "is more beneficial to the Student" than the altered school day. (*Id.* at 19 ¶ 30.) The ALJ cites no legal authority supporting this comparative standard and the Court is aware of none. The Court applies the standard described by the Supreme Court. *See Endrew F.*, 580 U.S. at 399.

evidence that the proposed IEP is reasonably calculated to enable Student to make progress appropriate based on his circumstances. The evidence shows that full-day instruction will provide Student with a FAPE.

Student's proposed IEP is "very rigorous," with six goals and over thirty-seven objectives. (Tr. at 1084; OAH-03321–42.) All members of Student's team except Parent agreed that Student should have a full school day. (Tr. vol. III at 83 (listing the school principal, director of special education, cooperative supervisor, speech therapist, "OT, DAPE, classroom teacher, [and] special education team"); *see also* Tr. at 1084.) According to the District's director of special education, an altered school day does not provide Student with enough time to work toward the objectives and goals identified in the proposed IEP. (Tr. at 1086, 1089.)

*Related Service.* The ALJ concluded that an altered school day was necessary for Student "to access the range of ABA services that he needs," and that those services are "required to assist a child with a disability to benefit from special education." (ALJ Order at 19 ¶ 28 (citing 20 U.S.C. § 1401(26)).) The parties do not dispute that ABA therapy has helped develop Student's verbal communication skills and his ability to regulate his behaviors. (ALJ Order at 18 ¶ 26.) Student's ABA provider testified that ABA therapy is medically necessary for Student. (Tr. at 380–81.) But evidence "demonstrating that ABA therapy is medically necessary for [Student] is not enough to establish that it is necessary

for him to access his education." *Smith v. Orcutt Union Sch. Dist.*, No. 21-55846, 2022 WL 3230594, at *2 (9th Cir. Aug. 10, 2022).

The ALJ concluded that without ABA services, Student would be "at significant risk for regression behaviorally" and would rely more often on aggression and biting to communicate needs. (ALJ Order at 18–19 ¶ 27.) In reaching this conclusion, the ALJ failed to address the District's ability to provide similar benefits to Student while he attends school. As explained above, the proposed IEP, with the proposed PBSP that includes FCT, works on the same skills that Student develops in ABA therapy.[19] According to the District, its FCT strategies will help Student complete schoolwork and meet other objectives of his proposed IEP. For example, when Student tries to escape a demand (such as completing schoolwork) by biting, staff will use an escape extinction practice to return Student to the work. (Tr. at 399–400, 740–41.) In addition, the District contends that Student will benefit from full day instruction of this sort, because it will allow Student to learn and interact with his peers, rather than at home with only his ABA provider. (*E.g.*, Tr. 893–95 (proposed IEP would allow Student to participate in swimming and bowling

---

[19] For example, ABA therapy teaches Student skills that help him in school, including teaching Student to respond with his words instead of his behaviors, to wait when given a denial, and to sit at a table and attend to tasks. (Tr. at 242–43.) The proposed IEP includes similar objectives. (*See, e.g.*, OAH-03324 (Goal 1, Objective 4 requires Student to work to complete an activity or remain on the activity for 10 minutes; Goal 1, Objective 5 requires Student to remain in emotional control for 30 seconds after a cue to "wait," "not yet," or "no").) The PBSP proposes to teach Student an alternative way to communicate his discontent, preferences, and requests rather than biting (which includes FTC), and strategies to ensure Student "comes back to demands." (OAH-03340–41.)

with other students).) This Court will not substitute its "own notions of sound educational policy for those of the school authorities." *Kass*, 101 F.4th at 570 (citation omitted). Because the Court concludes that the proposed IEP provides Student access to a FAPE, the ALJ's Order is reversed to the extent it concluded that the proposed IEP does not offer Student a FAPE.[20]

## CONCLUSION

Based on the above and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Kimball Area Public Schools, Independent School District No. 739's motion for judgment on the administrative record (ECF No. 23) is GRANTED; and

2.  I.R.M., by and through his Parent L.M.'s motion for judgment on the administrative record (ECF No. 30) is DENIED.

3.  The Amended Order of the Administrative Law Judge in OAH Docket No. 8-1300-39140 and OAH Docket No. 8-1300-39157 dated July 14, 2023, is REVERSED with respect to its conclusions requiring the District to provide support for I.R.M's service dog as part of I.R.M.'s Individualized Education Program and requiring I.R.M. to attend a shortened school day.

---

[20] Because the Court has determined that the District's proposed IEP offers Student a FAPE, it does not reach the parties' other arguments, including the issue of ALJ bias.

4.    The parties are to meet and confer about the implementation of the IEP that was proposed by the District on February 16, 2023, and report back to the Court within 30 days of the date of this Order.

5.    Kimball Area Public Schools, Independent School District No. 739 is deemed the prevailing party with respect to all Individuals with Disabilities Education Act claims asserted in OAH Docket No. 8-1300-39140 and OAH Docket No. 8-1300-39157.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: March 31, 2025                                BY THE COURT:

                                                     s/Nancy E. Brasel
                                                     Nancy E. Brasel
                                                     United States District Judge